**WAINWRIGHT REALTY COMPANY,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 91–1223C.

United States Court of Federal Claims.

May 18, 1993.

S.M. Chris Franzblau, Roseland, NJ, for plaintiff.

Kirk T. Manhardt, with whom were Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, Director, and Thomas W. Petersen, Asst. Director, Washington, DC, for defendant (Gill Ellen Bass and Michelle McDon-nell, Defense Logistics Agency, and Mark Johnson, Gen. Services Admin., of counsel).

*OPINION*

ANDEWELT, Judge.

I.

In this government contract action brought pursuant to the Contract Disputes Act (CDA), 41 U.S.C. § 601 *et seq.*, plaintiff, Wainwright Realty Company, seeks to recover $192,750 pursuant to a lease agreement it entered with the United States through the General Services Administration (GSA). The lease in issue covers a one-story office building in Springfield, New Jersey, and had a term of ten years, from June 1, 1981, through May 31, 1991. During the lease period, the Defense Contract Administration Service Management Area of the Defense Logistics Agency (DLA) occupied the building.

In this action, plaintiff seeks reimbursement for heating, ventilation, and air conditioning (HVAC) services plaintiff allegedly provided in the leased building outside of regular working hours between June 22, 1981, and May 25, 1986. Under the lease agreement, during regular working hours,[1] plaintiff was required to maintain a building temperature of 65°–68°F in the heating season and 78°–80°F in the air conditioning season. The lease further obliged plaintiff to provide the government with access to the leased building at all times, including Saturdays, Sundays and federal holidays. With regard to services during these "overtime" periods, the lease obliged plaintiff to provide "toilet facilities, chilled drinking water, and electricity for lights and operation of small office and business machines without additional payment." As to HVAC services, the lease required that "[o]vertime services for heat or airconditioning only shall be provided by the lessor *upon the request* of the Government at an hourly rate of $75.00" (emphasis added). During the period in issue, no employee of the GSA

asked for affirmative relief in absence of government claim).

1. The lease defines regular working hours as between 8:00 a.m. and 6:00 p.m., Monday through Friday, and obliged plaintiff to activate the HVAC system early enough so as to establish the requisite temperatures at the start of regular working hours.

or DLA ever requested that plaintiff provide overtime HVAC services. In its complaint, however, plaintiff alleges that it nevertheless should be paid for the overtime HVAC services it rendered.

This action is presently before the court on defendant's motion to dismiss the complaint pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction or, in the alternative, for summary judgment under RCFC 56. For the reasons set forth below, defendant's motion to dismiss pursuant to Rule 12(b)(1) is granted.

## II.

Plaintiff made its first written request for payment for the overtime HVAC services in a March 17, 1986, letter to the GSA. Therein, plaintiff stated that the clocks regulating the building's HVAC system had been set to turn the system on at 6:00 a.m. and to turn the system off at 6:00 p.m. seven days a week, and that plaintiff's "lax ... control" of overtime HVAC usage had obviated the need for the government to request the overtime HVAC services. Plaintiff further argued that under such circumstances, the government substantially benefitted and therefore should reimburse plaintiff for these services. Because the utility meters plaintiff had used in the building did not measure the amount of overtime HVAC services used, plaintiff calculated an amount due of $55,575 by estimating that the government used HVAC services for one six-hour period every other Saturday from the commencement of the lease through March 22, 1986.

In a July 18, 1986, letter to the DLA, plaintiff again requested that the government pay $55,575 for overtime HVAC services. However, in that letter, plaintiff abandoned its prior statement that the HVAC system had been operating seven days a week from 6:00 a.m. to 6:00 p.m., and instead stated that the HVAC system had been on a "24–hour, 7–day operation." In an August 22, 1986, letter to the GSA, plaintiff made a final request for payment and raised the amount due to $192,750. This increase in the amount due resulted from plaintiff estimating overtime usage at two hours per day five days a week, instead of one six-hour period every other Saturday.

On May 14, 1990, plaintiff submitted a certified claim for $192,750 to the GSA contracting officer. The contracting officer, however, did not respond to plaintiff's claim, and on June 17, 1991, plaintiff filed the instant complaint. In its complaint, plaintiff seeks to recover $192,750 on the ground that "[b]y having received and utilized heat and airconditioning beyond normal working hours during the period June 22, 1981, through May 25, 1986, without paying for such services, the United States has been unjustly enriched."

## III.

■ In its motion to dismiss, defendant contends that the instant action must be dismissed pursuant to Rule 12(b)(1) because a claim based on unjust enrichment is equitable in nature and falls outside of this court's jurisdiction. Defendant is correct in so describing the limits of this court's jurisdiction. As this court's predecessor, the Court of Claims explained in *Aetna Casualty & Surety v. United States*, 228 Ct.Cl. 146, 164, 655 F.2d 1047, 1059–60 (1981), that "[a] claim based on unjust enrichment ... proceed[s] from a perception that a party *ought* to be bound rather than ... agreed to be bound. [An] unjust enrichment ... theory of recovery is therefore based upon a contract implied in law, over which this court has not been given jurisdiction" (emphasis in original) (citations omitted).

Plaintiff does not dispute that this court lacks jurisdiction over claims based on unjust enrichment. Instead, plaintiff, in effect, contends that the court should interpret the instant claim as not being founded on unjust enrichment or, in the alternative, permit plaintiff to amend its complaint so as to present a new theory of recovery based upon traditional breach of contract principles. Plaintiff argues that although defendant never actually requested the overtime HVAC services, the government should be deemed to have requested the services and therefore should be held liable

under the lease's overtime services provision.

As to plaintiff's first alternative, the language in the complaint is unambiguous. The complaint rests on a theory of unjust enrichment and cannot reasonably be interpreted otherwise. As to plaintiff's second alternative, the court would permit plaintiff to amend its complaint if plaintiff could present an alternative theory of recovery that falls within this court's jurisdiction and on which plaintiff potentially could prevail. But, for the reasons set forth below, even assuming that the court would have jurisdiction over plaintiff's proposed traditional breach of contract claim,[2] such a claim would not survive summary judgment. A grant of summary judgment is appropriate where there is no genuine issue of material fact (*i.e.*, a fact that might affect the outcome of the suit) and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Herein, the parties have addressed the breach claim, there are no material issues of fact in dispute, and, for the reasons set forth below, defendant would be entitled to judgment as a matter of law. Therefore, the court will not require plaintiff to go through the futile act of amending its complaint and instead will dismiss the instant complaint for lack of jurisdiction.

### IV.

Plaintiff's contention that it has a viable breach of contract claim rests squarely on the Court of Appeals for the Federal Circuit's decision in *L.S.S. Leasing Corp. v. United States*, 695 F.2d 1359 (Fed.Cir. 1982). In *L.S.S. Leasing*, the plaintiff (the lessor) sought to recover payments from the federal government (the lessee) for services provided in two computer rooms in the leased building outside of regular business hours. Like the instant case, the government contended that the plaintiff could not recover any such payments because the government had never requested the services. The pertinent lease provision provided: "The Government will pay for overtime services requested by, and furnished to, the Government ... at the rate of $53.00 per hour irrespective of the number of floors or portions worked or the number of hours worked. The Lessor shall not be entitled to any other payment for said overtime services and shall not make any other claim therefor." *Id.* at 1364 (emphasis omitted). The Federal Circuit held that the plaintiff could recover payment for the overtime services even though the government never requested those services because on the particular facts of that case, "the [government's] deliberate use of [overtime] services [constituted] a constructive request." *Id.* at 1365. Plaintiff herein contends that the undisputed facts of this case demand the same conclusion. Plaintiff is incorrect.

In *L.S.S. Leasing*, the original overtime provisions contained in the lease had been amended to respond in part to greater than expected overtime work in the building. The original lease agreement obliged the lessor to provide only overtime elevator service and heating and air conditioning services. The government apparently was obliged to pay only for the overtime heating and air conditioning services and the payments were calculated using a cumbersome process of auditing actual costs. In the amended lease, the parties adopted a different approach. Overtime service was expanded to cover all standard building services, *e.g.*, porter service, hot and cold running water and sewerage, alternating electrical current, chilled drinking water,

---

2. Defendant contends that plaintiff's breach of contract theory would constitute a "new" claim and that this court would lack jurisdiction over such a claim because plaintiff never submitted this claim to the contracting officer for a final decision pursuant to Section 6(a) of the CDA. There is case law that potentially supports a conclusion that a contractor need not return to the contracting officer for a new decision when it merely presents an alternative legal theory to support a claim previously denied. *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed.Cir.1990); *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir. 1987); *Solar Turbines, Inc. v. United States*, 16 Cl.Ct. 304, 311 (1989). But this court need not resolve this issue because, for the reasons set forth herein, plaintiff could not prevail on its breach of contract theory.

and parking. In addition, the payment procedure was simplified. The auditing process was eliminated and a flat fee of $53 per hour was adopted for each hour of overtime services requested, regardless of the quantity of services used.

When interpreting what the parties meant by the phrase "[t]he Government will pay for overtime services requested by ... the Government," the *L.S.S. Leasing* court focused on the broad scope of the overtime services covered by the $53 hourly fee. The court noted that compensable overtime was no longer limited to heating and air conditioning, and stressed that "[i]f no request was properly made, the lessor had no obligation to allow use of the building facilities, *i.e.*, lavatories, lobby, elevators, lights in hallways, and the like." *Id.* But these services are prerequisites for sustaining a functional work environment. Therefore, when the government sent its employees into the leased building outside of regular working hours, it necessarily recognized not only that the employees would avail themselves of the services, but also that the contract anticipated the government would request and pay for these services on a flat-fee basis. On the facts of *L.S.S. Leasing*, the court was therefore able to conclude that the services were "not only received, but actually desired" by the government. *Id.* The court reasoned that a formal request for any of these services was unnecessary because they were available "on demand" (*i.e.*, when an employee turned on the light, he or she was able to use the electricity) and that the deliberate use of the services amounted to a "constructive request" for the services.

■ No similar conclusion is possible here. Unlike in *L.S.S. Leasing*, in the instant case, heating and air conditioning were the *exclusive* criteria for compensable overtime. The government specifically reserved for itself the right to access the building at all times, with no extra cost for standard overtime services such as lights and lavatories. Therefore, unlike *L.S.S.*

*Leasing*, when the government sent its employees into the leased building, it did not necessarily anticipate that the employees would avail themselves of compensable overtime services or that the government would have to pay for such services in the absence of a specific request. Because the contract indicates that the government anticipated that overtime work potentially could be accomplished without employees utilizing the compensable overtime services, *i.e.*, heating and air conditioning, no similar conclusion is possible that defendant "not only received, but actually desired" the services.

In this regard, in interpreting and applying *L.S.S. Leasing* to the instant case, it is crucial to recognize that the "upon the request of the Government" limitation that the parties included in the instant contract served an important function that is not discussed in *L.S.S. Leasing*. This provision permitted the government to meter and control its overtime costs by establishing procedures that regulated the extent to which its employees could request overtime heating and air conditioning services. This function is apparent from a review of the parties' actions subsequent to the period from June 22, 1981, through May 25, 1986. In May 1986, plaintiff replaced the then-existing clocks regulating the HVAC system and installed new clocks attached to meters which gave plaintiff, for the first time, the capability to measure accurately the extent of HVAC services used outside of regular working hours. Between May 26, 1986, and December 1, 1987, the DLA occasionally requested overtime HVAC services and plaintiff provided the services at a total cost of $47,583.75. But during this period, the government changed its procedure for authorizing HVAC overtime services. In a March 12, 1987, letter to plaintiff, the GSA building manager requested "that effective immediately, [plaintiff] not provide *any* overtime services for [the DLA] until [plaintiff] receive[s] authorization from [the GSA]" (emphasis in original).[3] From December 1, 1987, through the

---

**3.** Citing Clause 15 of the lease, defendant argues that throughout the entire term of the lease, only the GSA contracting officer had the author-

ity to request overtime HVAC services. But Clause 15 provides:

end of the DLA's tenancy in May 1992, a period of nearly four and one-half years, the GSA never authorized and never paid for any overtime HVAC services.[4] Thus, by changing its internal procedures and relying on the lease's "upon the request" provision, defendant apparently was able to eliminate all overtime HVAC costs.[5]

Permitting plaintiff to recover herein would circumvent the lease's "upon the request of the Government" provision and thereby deny the government the ability to meter and control its overtime costs. Plaintiff seeks to recover payments for overtime HVAC services starting in 1981, yet apparently never suggested to the government until early 1986 that plaintiff would be charging for these costs.[6] Lacking knowledge that plaintiff intended to charge the government for such overtime services, defendant could hardly have made an informed decision to change its conduct so as to avoid or limit such costs.

One final point warrants mention. Suits in which one party to a contract provides a service and the other party accepts the service but then refuses to pay for that service based on its interpretation of the contract are obviously troublesome from an equity perspective. But there are other considerations involved. The parties to a contract have the opportunity to define their contractual responsibilities during contract negotiations, and holding the parties to the plain meaning of the contract terms has the salutary effect of encouraging the parties to define their contractual responsibilities with care and to pay heed to the contractual terms when purporting to act thereunder. Herein, plaintiff was correct in its March 17, 1986, letter when it stated, in effect, that the problem of payment for overtime HVAC services arose because of plaintiff's "lax ... control" over such services. A careful reading of its contractual obligations most certainly would have advised plaintiff against setting its HVAC system to run during overtime periods in the absence of any request by the government. In the instant case, the government had the right to rely on the lease provision and to expect that it would not be held liable years later for "unrequested" overtime services based on a theory of "constructive request."

## Conclusion

For the foregoing reasons, defendant's motion to dismiss is granted and the Clerk of the Court is directed to dismiss the complaint for lack of jurisdiction. No costs.

IT IS SO ORDERED.

The lessor will not be reimbursed for any service not provided for in the lease, including but not limited to repairs, alterations or overtime services, nor will any rental be paid for occupancy in whole or in part except for the lease term specified in this lease executed by the [GSA], unless approved in advance by the Contracting Officer.

Hence, by its terms, Clause 15 applies only to services "not provided for in the lease," and overtime HVAC services are specifically provided for in the lease. Clause 11, as drafted by the government, obligates the lessor to provide overtime services "upon the request of the *Government*" (emphasis added). Clause 11 does not state that the tenant agency, here the DLA, lacks the authority to represent the government in making such a request.

4. Plaintiff asserts that during the period from May 26, 1986, through December 1, 1987, the GSA approved the DLA's periodic requests for overtime HVAC services.

5. The record does not establish whether overtime work occurred during the post-December 1, 1987, lease period, and, if so, whether the government found an alternative to the HVAC services, such as electrical space heaters, fans, or opening and closing the building's casement-style windows.

6. Plaintiff also contends that certain DLA employees tampered with the building's controls so as to secure HVAC services outside of regular working hours. However, plaintiff does not present any evidence to suggest that responsible authorities within the GSA or DLA were ever made aware of such actions. In this context, the unauthorized actions of government employees cannot be deemed to constitute an authorized request for overtime services by the GSA or DLA.